# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

**CEPHIS JACKSON and GERALDINE**                                **PLAINTIFFS**
**KATRINA JACKSON**

**v.**                                                          **CAUSE NO. 1:20-cv-370-LG-RPM**

**PARKER-HANNIFIN**
**CORPORATION; JOHN DOE**                                       **DEFENDANTS**
**DEFENDANTS A-E; JOHN DOE**
**DEFENDANTS F-R; and JOHN DOE**
**DEFENDANTS S-Z**

## MEMORANDUM OPINION AND ORDER
## REGARDING THE PARTIES' DAUBERT MOTIONS

**BEFORE THE COURT** are a [134] Daubert Motion filed by Defendant

Parker-Hannifin Corporation and four [135] [138] [140] [142] Daubert Motions filed

by Plaintiffs Cephis Jackson and Geraldine Katrina Jackson.  All Motions are fully

briefed.  After review of the parties' filings, the record in this matter, and the

applicable law, the Court finds that the five Motions should denied for the reasons

stated below.[1]

---

[1] In resolving the *Daubert* Motions, the Court has found a non-trivial amount of overlap between the experts' opinions.  "Given the guidance from the Fifth Circuit to exclude evidence under Rule 403 only sparingly, the Court will not arbitrarily limit" the parties "to just one expert.  However, if [the parties] seek[ ] to introduce testimony that is 'merely repetitious and cumulative of testimony already introduced, it may be excluded at trial."  *Marquette Transp. Co. Gulf-Inland, LLC v. Nagivation Maritime Bulgarea*, Civ. No. 19-10927, 2022 WL 158681, at *5 (E.D. La. Jan. 18, 2022).  The Court will defer this subject at this time.  However, the parties are encouraged to consider the issue of duplicative or cumulative testimony and be prepared to discuss the matter in more detail at the pretrial conference.

BACKGROUND

This products liability lawsuit involves allegations that a Model 62-5 Cutting Torch and hose assembly malfunctioned while being operated by Plaintiff Cephis Jackson on October 20, 2017, a Huntington Ingalls Shipbuilding employee in Pascagoula, Mississippi. The torch was fueled through twin line hoses of propylene and oxygen. These hoses were manufactured by Defendant Parker-Hannifin Corporation. The torch/hose assembly allegedly caused an explosion and fire which severely injured Plaintiff. (*See* Am. Compl. ¶¶ 19-22, ECF No. 9). Plaintiffs, Geraldine and Cephis Jackson, bring claims against Defendant Parker-Hannifin Corporation under the Mississippi Products Liability Act for failure to warn, negligence, and breach of warranty. (*Id.* ¶¶ 23-66).

A jury trial in this matter is currently scheduled to begin in January 2023, and each side has retained expert witnesses. The parties have filed a host of *Daubert* Motions seeking to exclude or limit testimony of expert witnesses. Defendant, Parker-Hannifin Corporation, filed a [134] Daubert Motion to Exclude or Limit the Testimony of Plaintiffs' Expert, Brian Babcock, while Plaintiffs filed Daubert Motions to Exclude [135] Timothy Rhoades, [138] Richard Edwards, [140] Joseph Ellington, and [142] Ronald Moner.

DISCUSSION

## I.   Motion to Exclude Expert Testimony Standard

Rule 702 of the Federal Rules of Evidence provides that an expert witness

"who is qualified as an expert by knowledge, skill, experience, training, or

education" may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The party offering the proposed expert must prove by a

preponderance of the evidence that the expert's proffered testimony satisfies Rule

702.  *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).  "An expert

witness's testimony should be excluded if the district court 'finds that the witness is

not qualified to testify in a particular field or on a given subject.'"  *Carlson v.

Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *Wilson

v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).  In addition, "expert testimony is

admissible only if it is both relevant and reliable."  *Pipitone v. Biomatrix, Inc.*, 288

F.3d 239, 243 (5th Cir. 2002).  "Expert testimony which does not relate to any issue

in the case is not relevant and, ergo, non-helpful."  *Daubert v. Merrell Dow Pharm.,

Inc.*, 509 U.S. 579, 591 (1993).  To be reliable, an expert's opinions must be based on

sufficient facts or data and must be the product of reliable principles and methods.

Fed. R. Evid. 702(b), (c).  Ultimately, it is the court's responsibility "to make certain

that an expert . . . employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v.

- 3 -

*Carmichael*, 526 U.S. 137, 152 (1999).

Rule 702 does not require an expert to be highly qualified to testify, however, the court will evaluate the witness's knowledge, skill, experience, training, or education with respect to the subject matter of the testimony. *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009). Generally, a lack of specialization should go to the weight of the evidence rather than its admissibility and "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *United States v. Wen Chyu Liu*, 716 F.3d 159, 168-69 (5th Cir. 2013) (quoting *Daubert*, 509 U.S. at 596). Thus "an expert witness is not strictly confined to his area of practice but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Id.* (quoting *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)).

## II.   The *Daubert* Motions

### A.   Brian Babcock

First, the Court considers Defendant Parker-Hannifin Corporation's [134] Motion Challenging the Admissibility of Plaintiffs' Expert, Brian Babcock's Testimony. Mr. Babcock's expert report outlines his "25 years['] experience as a chemical engineer" beginning with obtaining his "Bachelor's and Master's degrees in chemical engineering from Vanderbilt University in 1993 and 2001, respectively."

(Expert Report, at 1, ECF No. 134-1).  Since that time, Mr. Babcock has worked in various chemical engineering capacities in industry and currently serves as the founder of Polymer Chemistry and Coating Technologies, LLC, which conducts "consulting and development work on new applications involving polymers and coatings." (*Id.*).  He also serves as president and founder of Surnetics, LLC.  (*Id.*).  Mr. Babcock reports having "experience in polymer processing and manufacturing along with developing coating formulations and processes for bonding to many different plastic, metal, or glass surfaces." (*Id.*).  He also documents his portfolio of 19 patents and patent applications.  (*Id.*).  In this litigation, Mr. Babcock has rendered opinions regarding the degradation of polychloroprene in the subject hose. (*Id.* at 37-38 ¶¶ 1-7).  Defendant attacks Mr. Babcock's expertise and opinions on several grounds.

First, Defendant argues that Mr. Babcock is not qualified to provide testimony on the subject of industrial or hydraulic hoses.  Defendant cites the case of *Gholar v. A O Safety*, 39 F. Supp. 3d 856 (S.D. Miss. 2014), in which the Court ruled that a safety engineer had insufficient expertise to opine on safety goggle design, where the expert had no experience working for any safety goggle manufacturer, nor designing or manufacturing them, nor ever published articles relating to safety goggle design, or had any involvement whatsoever in safety goggle warnings.  *Id.* at 860.  The Court concluded that the safety engineer could not show "that his training or experience as a safety engineer" translated into "expertise in

the field of safety goggle design or manufacture."  *Id.*  Defendant likens this case to Mr. Babcock—his training and experience in chemical engineering with polymers and fuels generally does not translate into expertise concerning the use of the specific polymer at issue, polychloroprene, in the subject industrial hose.  (Daubert Mot., at 4, ECF No. 134).  Plaintiffs respond that Federal Rule of Evidence 702 allows qualification of an expert in more ways than simply experience, viz. "knowledge, skill, experience, training, or education."  (Pl.'s Resp. Opp. Daubert Mot., at 2-3, ECF No. 149).  Plaintiffs cite *United States v. Wen Chyu Liu*, 716 F.3d 159 (5th Cir. 2013), for the proposition that an expert may offer testimony regarding "related applications" of his area of practice outside his specialization.  *Id.*

The Court finds Plaintiffs' argument persuasive.  For instance, in *Graves ex rel. W.A.G. v. Toyota Motor Corp.*, the plaintiffs in a product liability action against a car manufacturer retained a biomedical engineer to testify on the safety of the "occupant protection system" within a vehicle.  No. 2:09CV169-KS-MTP, 2011 WL 4625549, at *1-2 (S.D. Miss. Oct. 3, 2011).  The defendant argued that "the occupant protection system—in particular, the seatbelt in the subject vehicle—is outside her area of expertise because she is not a 'seat belt expert.'"  *Id.* at *5.  After extensively documenting her qualifications in related fields, the Court said: "Dr. Bidez does have vast training, knowledge, and experience in analyzing how a particular design attribute may have led to a particular injury," given her biomechanical engineering background.  *Id.* at *8.  Similarly, the Court finds that Mr. Babcock is sufficiently

qualified to opine on industrial or hydraulic hoses as a related application of his decades' worth of chemical engineering experience with polymers "in surface science, material analysis, and material compatibilities." (Expert Report, at 1, ECF No. 134-1). Although Mr. Babcock is not a "hose expert" or a "polychloroprene expert," the Court finds that he is sufficiently qualified to address the subject given his experience with "polymer failure and safety analysis" generally. (*See id.*; *see also* Decl. Brian Babcock ¶ 6, ECF No. 149-4).

Second, Defendant argues that Mr. Babcock's opinions are based on unreliable speculation concerning the chemical effects of the polymer at issue, viz. polychloroprene. Defendant argues that Mr. Babcock's peer-reviewed sources do not particularly study "the interaction between polychloroprene and propylene, and instead study polymers and their reaction to other environmental conditions such as heat, light, and oxidation," or polychloroprene's interaction with solvents other than propylene. (Daubert Mot., at 6, ECF No. 134). Defendant cites *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347 (5th Cir. 2007), in which the Fifth Circuit affirmed the district court's exclusion of an expert whose opinion was based on insufficiently specific sources. *Id.* The Court noted one source which involved "organic solvents" generally, without focusing on the organic solvent at issue in the case, and affirmed exclusion of the opinion. *Id.* at 353.

Plaintiffs respond that Defendant demands a higher degree of support from published studies than the Fifth Circuit requires. *See id.* at 354. Plaintiffs further

respond that Mr. Babcock used these studies in comparison to the degradation shown in the Fourier Transform Infrared (FTIR) analyses, discussed below, regardless of the mechanism of degradation—heat, light, and oxidation.  (Pl.'s Resp. Opp. Daubert Mot., at 8-9, ECF No. 149).  Plaintiffs argue that the studies are distinguishable from those in *Knight* and *Watts v. Radiator Specialty Co.*, 990 So. 2d 143 (Miss. 2008), because they are peer-reviewed and directly support his conclusion in showing that the peaks revealed in an FTIR analysis indicate polymer degradation, although they did not precisely test the interaction between polychloroprene and propylene.

The Fifth Circuit did "not suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions." *Knight*, 482 F.3d at 354.  Rather, "under *Daubert* and Fed. R. Evid. 702, a district court has discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion." *Id.* (noting that "in epidemiology any study hardly is ever conclusive").  In addition, "[w]here an expert otherwise reliably utilizes scientific methods to reach a conclusion, lack of textual support may 'go to the weight, not the admissibility' of the expert's testimony." *Id.* (citing *Fed. Deposit Ins. Corp. v. Suna Assocs., Inc.*, 80 F.3d 681, 687 (2d Cir. 1996)).  Here, as detailed below, Mr. Babcock conducted a trio of FTIR analyses to support his opinion. Defendant has not assailed the FTIR testing as unreliable or an unaccepted methodology in the field.  Hence, the problems it raises with Mr. Babcock's sources

are issues of testimony weight, not admissibility.

Next, Defendant disputes the three FTIR analyses which Mr. Babcock incorporated into his opinion. The first such test, conducted July 22, 2021, compared the oxygen to the fuel line of the hose to determine whether the propylene fuel was the cause of degradation. (*See* Expert Report, at 23-24, ECF No. 134-1). Defendant claims that "[b]lack hose from the fuel line at the unburned end of the hose did *<u>not</u>* have a comparison with black hose from the oxygen line at the unburned end of the hose." (Daubert Mot., at 9-10, ECF No. 134) (emphasis in original). As to the second and third FTIR tests, Defendant claims that these tests improperly compared the spectra of the subject hose, composed of both polymers and additives, to spectra of pure polymers. (*Id.* at 10). Defendant also cites Mr. Babcock's testimony that "there's no—basically no verification that their—that the materials they're using meet their spec." (Dep. Brian Babcock, 22:5-16, ECF No. 134-2).

Plaintiffs defend these tests, countering that Mr. Babcock has twenty years of FTIR analysis experience and that the tests were conducted pursuant to a common methodology. (Decl. Brian Babcock ¶¶ 5-7, ECF No. 149-4). Plaintiffs also respond that Mr. Babcock's report compares the hose to an appropriate exemplar hose. (*See* Pl.'s Resp. Opp. Daubert Mot., at 7, ECF No. 149) (citing Expert Report, at 30-31, ECF No. 134-1). Plaintiffs explain that Defendant has "not provided any manufacturing process data that shows the individual batches were actually

manufactured to their proper composition" nor that "the components of the blend were added in the proper amounts during the manufacturing process." (*Id.* at 7-8). Plaintiffs add that Defendant failed to show that additives would have changed the result of the analysis. (*Id.*).

Here again, the Court finds that Defendant's arguments challenge the weight of Mr. Babcock's FTIR analyses rather than their admissibility. In a similar case, this Court admitted an expert retained to determine the cause of a leak in the plaintiff's boiler. *Miss. Phosphates Corp. v. Furnace & Tube Servs., Inc.*, No. 1:07CV1140-LG-RHW, 2009 WL 10676559, at *4 (S.D. Miss. Aug. 5, 2009). The expert conducted an experiment using sample tubes in which he controlled for certain conditions and not for others; for instance, "the metal used for the mock-up tubes was different from the actual boiler tubes." *Id.* at *5. This Court, noting that the experiment was the basis for the expert's opinion, recited the rule that "'questions relating to the bases and sources of an expert's opinion, rather than its admissibility, should be left for the jury's consideration.'" *Id.* (quoting *14.38 Acres of Land*, 80 F.3d at 1077). "Questions about the dissimilarities between the test and the actual boiler should go to the weight that the jury gives the tests and the resulting opinion, rather than compel exclusion altogether." *Id.* The same result obtains here. Defendant does not challenge the scientific validity of an FTIR analysis as a method, but rather Mr. Babcock's interpretations and conclusions.

Next, Defendant argues that Mr. Babcock employed unreliable methods by

failing to conduct further testing, rendering his opinion *ipse dixit*.  Defendant reasserts its arguments that Mr. Babcock's studies were unreliable and adds that he failed to account for alternative explanations for the accident.  For instance, Defendant claims that he failed to account for "duct tape discovered around the hose and how it could relate to the leak that fueled the subject fire."  (*Id.* at 12).  Defendant also claims that Mr. Babcock ignores the manner of treatment and storage of the hose between the incident and his testing, and how such treatment could relate to the visible damage and wear on the hose.  (*Id.* at 13).  Plaintiffs state that these issues go to the weight of the evidence rather than its admissibility.  (Pl.'s Resp. Opp. Daubert Mot., at 10-11, ECF No. 149).  Plaintiffs add "that the defective condition of the product also consisted of the failure to use a spring guard as standard equipment on the subject hose."  (*Id.* at 11).

In the Court's view, "elimination of alternative possibilities is one method of arriving at a result reliably, but it is not the only method."  *Chisesi Bros. Meat Packing Co., Inc. v. Westchester Surplus Lines Ins. Co.*, Civ. No. 09-6523, 2010 WL 3720465, at *4 (E.D. La. Sep. 9, 2010) (admitting an expert opinion assuming that a hurricane was the cause of room damage, as while "his failure to eliminate other possible causes may undercut the strength of his opinion, it does not affect the admissibility of that opinion") (citing *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss.*, 80 F.3d 1074, 1079 (5th Cir. 1996)).  Plaintiffs and Defendant have proposed alternative candidates for the cause of the

fire, an open question which has not been conclusively established.  "When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.  The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other."  Fed. R. Evid. 702 Advisory Committee's Note.  Thus, when "the answer to the critical causation question will depend on which set of predicate facts the fact-finder believes," "a trial court must take care not to transfer a *Daubert* hearing into a trial on the merits."  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249-50 (5th Cir. 2002) ("The fact-finder is entitled to hear [an expert]'s testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate.").

Finally, Defendant argues that Mr. Babcock should be excluded because his testimony will confuse the jury.  Defendant claims that Mr. Babcock's opinion regarding the alleged polymer degradation is unrelated "to any articulable industry standard that would guide the factfinder on legal and factual issues," and, further, that it contradicts the evidence in this case that the hose was subject to poor treatment.  (*Id.* at 14).  Plaintiffs respond that "Mr. Babcock relies on well-established criteria and objective testing to support his conclusions that the hose at issue suffered from degradation."  (Pl.'s Resp. Opp. Daubert Mot., at 11, ECF No.

149).  The Court is not convinced.  Mr. Babcock's opinion regarding causation is certainly relevant to the factual issues in dispute.  Plaintiffs are entitled to present their case at trial with the support of his testimony, given that Defendants have not shown that he has employed unreliable methodologies or arrived at baseless conclusions.  To the extent that Defendant is unsatisfied with Mr. Babcock's interpretations of the evidence and unfavorable conclusions, it is free to engage in "[v]igorous cross-examination" and "presentation of contrary evidence," two of the "traditional and appropriate means of attacking shaky but admissible evidence." *Wen Chyu Liu*, 716 F.3d at 168-69.  When experts testify, competing conclusions is not a new concept.  But it is the role of the factfinder to weigh testimony and resolve conflicting conclusions.  Defendant's [134] Motion to Exclude Mr. Babcock should be denied.[2]

## B.    Timothy Rhoades

Next, the Court considers Plaintiffs' [135] Motion to Exclude the Testimony of Defendant's Expert, Dr. Timothy Rhoades.  Dr. Rhoades is a licensed professional engineer who maintains "a B.S.E., M.S.E, and Ph.D. in Industrial and Operations

---

[2] Defendant also briefly argues that Mr. Babcock's opinion should be excluded because his opinion does not "grow[ ] naturally and directly out of research [he has] conducted independent of the litigation" but was rather "developed . . . expressly for purposes of testifying."  *See* Fed. R. Evid. 702 Advisory Committee's Note (citing *Daubert*, 43 F.3d at 1317).  However, Defendant has not shown that Mr. Babcock does not perform the same or similar tests routinely and independently of this case, given his experience and expertise in "polymer failure and safety analysis" as well as "surface science, material analysis, and material compatibilities."  (Expert Report, at 1, ECF No. 134-1).

Engineering from the University of Michigan," and has research experience in "studies related to warnings and instructions" and has presented findings to government safety agencies "on topics related to human factors, product hazards, risk assessment, and safety communications." (Report of Findings, at 1-2, ECF No. 135-7). In this litigation, Dr. Rhoades has rendered several opinions relating to the safety procedures utilized by Ingalls and the warnings and information provided by Defendant in its catalog. (*Id.* at 3-6). Plaintiffs object to five of Dr. Rhoades's opinions on the basis that they are speculative or unreliable, but not to Dr. Rhoades's credentials or general methodology. Defendant generally responds that Plaintiffs' arguments go to the weight rather than the admissibility of evidence and are better suited for cross-examination. The Court agrees.

First, Plaintiffs argue that Dr. Rhoades should not be allowed to opine the following: "[a]ccident investigation records suggest the possibility that Mr. Jackson used oxygen to dust his clothing. Such behavior should be strictly prohibited." (Report of Findings, at 4 ¶ 4, ECF No. 135-7). Plaintiffs maintain that the factual basis of this opinion is contradicted by Plaintiff Cephis Jackson's deposition testimony, in which he reports that he did not use an air line or fuel line to blow debris off his clothes. (*See* Dep. Cephis Jackson, at 164:16-24, ECF No. 135-2). Defendant points to the post-accident Incident Summary, which suggests, under a heading labeled "Potential Causes," that Plaintiff "may have used the cutting torch to 'blow himself down' to remove potential debris from his clothing." (*See* Incident

Summary, at 2, ECF No. 156-1).  Hence, Dr. Rhoades's opinion assumes a fact which is in dispute.  Again, when "the answer to the critical causation question will depend on which set of predicate facts the fact-finder believes," "a trial court must take care not to transfer a *Daubert* hearing into a trial on the merits."  *Pipitone*, 288 F.3d at 249-50 ("The fact-finder is entitled to hear [an expert]'s testimony and decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate.").  Hence, the Court will not exclude this opinion merely because Plaintiffs dispute its factual assumptions.[3]

Second, Plaintiffs argue that the Court should exclude Dr. Rhoades's opinions regarding Defendant's treatment of the hose in its catalog, which are essentially responses to Plaintiffs' expert, Dr. Kalsher.  (Report of Findings, at 5 ¶¶ 6-7, ECF No. 135-7).  Specifically, Dr. Rhoades rejects Dr. Kalsher's opinions (1) that Defendant should have listed the subject hose as incompatible or not recommended with propylene and (2) that Defendant should have informed end users that propylene fuel would degrade the hose in a manner undetectable without the use of complex equipment and that the hose should be subject to regular testing.  (*Id.*).  Plaintiffs argue that Dr. Rhoades improperly focuses on certain beneficial sections

---

[3] Plaintiffs have moved to exclude evidence "that the Plaintiff was possibly using oxygen to dust his clothing prior to the fire."  (Mot. Limine, at 3, ECF No. 165).  The Court will take up this matter at the appropriate time.  If that Motion is granted, then Dr. Rhoades's opinion on this precise matter may be rendered irrelevant.

of the catalog but neglects to include other sections stating that propylene and chloroprene are "Not Recommended" in combination.  (Pl.'s Mem. L. Supp. Mot. Exclude, at 10, ECF No. 136).  Dr. Rhoades distinguished this latter section in that "[t]he subject hose is Grade T," which "eliminates 'gas compatibility, oil resistance and flammability issues'" and that the latter section "does not mean the subject Grade T hose is incompatible with propylene fuel gas." (Report of Findings, at 5 ¶ 6, ECF No. 135-7).  Plaintiffs also claim that Defendant improperly shifts the responsibility of safety to end users and purchasers to ensure the compatibility of the hose with various fuels, which testing requires complex and specialized equipment.  (Pl.'s Mem. L. Supp. Mot. Exclude, at 10, ECF No. 136).  Plaintiffs also object to Dr. Rhoades's citation to certain industry standards in support of his contention that polychloroprene is not degraded by propylene, but to argue that it thereby renders Defendant's "Not Recommended" label misleading.  (*Id.*).

Plaintiffs does not cite any authority that allows the Court to exclude Defendant's expert on these grounds.  The Court finds that these arguments, too, essentially revolve around factual differences at the heart of the parties' dispute about liability.  They do not reach the admissibility of the expert opinion but rather its weight and credibility.  "[I]n determining the admissibility of expert testimony, the district court should approach its task 'with proper deference to the jury's role as the arbiter of disputes between conflicting opinions.  As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be

assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., State of Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (citing *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).  Dr. Kalsher and Dr. Rhoades's differences constitute "a 'battle of the experts,' and the jury 'must be allowed to make credibility determinations and weigh the conflicting evidence in order to decide the likely truth of a matter not initially resolvable by common knowledge or lay reasoning.'" *Garner v. Santoro*, 865 F.2d 629, 644 (5th Cir. 1989) (quoting *Osburn v. Anchor Labs., Inc.*, 825 F.2d 908, 916 (5th Cir. 1987)).

Third, Plaintiffs challenge two further opinions of Dr. Rhoades which contradict those of Plaintiffs' expert Dr. Kalsher.  Specifically, Dr. Rhoades rejects Dr. Kalsher's conclusions (1) that current safety consensus supports "a 'need to utilize' spring guards or another device for stress relief" and (2) that there is an industry consensus "that spring guards are necessary or that warnings on this topic are needed." (Report of Findings, at 6 ¶ 8, ECF No. 135-7).  Dr. Kalsher's opinion refers to several performance standards, including some explaining how to avoid cracked hoses and some advising readers not to use hose showing leaks, burns, worn places, or other defects.  (Pl.'s Mem. L. Supp. Mot. Exclude, at 13, ECF No. 136).  Plaintiffs complain that Defendant "should have emphasized this important information in its catalog" and explained these industry standards, and "should have included stress relief standard equipment" or "explicitly warned about the

conditions under which a customer should use one." (*Id.* at 13-14). Plaintiffs also cite the testimony of two individuals named Chris Helton and Johnny Pope, who generally opined that the hose is not necessarily unusable from the visible deformities. (*Id.*).

Again, this argumentation merely restates Plaintiffs' factual positions and conclusions and does not challenge the actual reliability or methodology animating Dr. Rhoades's opinion. Defendant is entitled to resist Dr. Kalsher's opinions with its own expert testimony on the subject, given that Plaintiffs do not seriously challenge Dr. Rhoades's qualifications or methodology. The Court finds that these factual disputes concerning Defendant's liability to Plaintiffs are material better suited for cross-examination. *See 14.38 Acres of Land*, 80 F.3d at 1077. The [135] Motion to Exclude Dr. Timothy Rhoades is denied.

### C.    Richard Edwards

Next is Plaintiffs' [138] Motion to Exclude Defendant's Expert, Mr. Richard Edwards. Mr. Edwards holds a Bachelor of Science in Materials Science and Engineering and has completed three years of Post-Baccalaureate Studies at North Carolina State University. (Report, Appendix I, at 47, ECF No. 138-7). He currently serves as a consulting engineer at Engineering Design & Testing Corp. in Birmingham, Alabama. (*Id.*). In this litigation, Mr. Edwards has rendered several opinions relating to the composition of the hose, the effects (if any) of propylene on its integrity, and the cause of the accident at issue. (*Id.* at 27-28). Plaintiffs

individually dispute several of these opinions.

Plaintiffs first object to Mr. Edwards' opinion that Defendant's "inner tube compound is resistant to effects from propylene and could not degrade to failure during its total service lifetime." (Report, at 27 ¶ 2, ECF No. 138-7). Mr. Edwards bases his opinion on a test of the hose conducted under conditions that Plaintiffs deem insufficient. (Pl.'s Mem. L. Supp. Mot. Exclude, at 9-10, ECF No. 139). Specifically, Plaintiffs argue that customer use would realistically involve "changes in temperature, humidity, UV exposure, and stop and start of gas flow," conditions which Plaintiffs deny were present in the testing. (*Id.* at 9). Thus, claim Plaintiffs, "[m]ass loss during actual use conditions could vary widely and could be significantly faster," while Mr. Edwards assumed a constant rate of loss and that the state of the propylene is irrelevant, assumptions which Plaintiffs dispute. (*Id.*). Defendants argue that the test "was specifically performed to measure the effects from propylene on the inner tube degradation" and that these other conditions are irrelevant. (Def.'s Mem. Br. Supp. Resp. Opp. Pl.'s Mot. Exclude, at 11-12, ECF No. 151). Here, Plaintiffs' issues with Mr. Edwards' test are not attacks on the methodology itself but rather the conditions of the test and its fidelity to real-world circumstances. *See Miss. Phosphates Corp.*, 2009 WL 10676559, at *4 ("Questions about the dissimilarities between the test and the actual boiler should go to the weight that the jury gives the tests and the resulting opinion, rather than compel exclusion altogether."). Again, Plaintiffs do not challenge the methodology of the

study itself, but rather its conditions, and such disputed issues are better suited for resolution by cross-examination than by a *Daubert* Motion.

Next, Plaintiffs object to Mr. Edwards' opinion that "[t]he FTIR does not show any discernible effects from the propylene." (Report, at 27 ¶ 3, ECF No. 138-7). Plaintiffs interpret the FTIR spectra differently than Mr. Edwards and claim that "the exemplar hose did not show significant degradation peaks while the degradation peaks were seen in the subject fuel hose." (Pl.'s Mem. L. Supp. Mot. Exclude, at 10, ECF No. 139). This disagreement regards the interpretation of the FTIR analysis. Plaintiffs do not dispute the scientific validity of the FTIR analysis itself but rather Mr. Edwards' interpretation. *See United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*, No. 1:06CV0433-LTS-RHW, 2010 WL 3359564, at *2 (S.D. Miss. Aug. 25, 2010) ("While State Farm's experts' opinions are inconsistent with Sinno's opinions, there is no indication that the differences are based upon anything other than different interpretations of the evidence. Without evidence that directly addresses flaws in Sinno's calculations or evidence that establishes that Sinno's methodology is not within professional engineering norms, the Court is not in a position to independently evaluate Sinno's engineering calculations or to conclude that the methodology he followed is not of a type generally accepted in the field."). Again, the Court finds that the factfinder will consider the strengths and weaknesses of the testimony and Plaintiffs will have the opportunity to cross-examine Mr. Edwards regarding his interpretation of the FTIR spectra.

Third, Plaintiffs take issue with Mr. Edwards' opinion regarding the condition of the hose before the accident, that it had been "damaged by working conditions and abuse," including visible "[c]rimp shell deformation" in the hose cover and the discovery of the "blue duct tape" covering a previous leak.  (Report, at 27 ¶ 4, ECF No. 138-7).  Plaintiffs argue that "there was no evidence or testimony as to the cause of the conditions of the hose" and advances the "actual fire itself as the cause of the hose's condition upon inspection after the fire," along with witnesses to the fire trampling the hose as they arrived to help.  (Pl.'s Mem. L. Supp. Mot. Exclude, at 11, ECF No. 139).  Plaintiffs also explain the blue duct tape with alternative theories, including identification purposes and tangling prevention.  (*Id.* at 12) (citing OSHA § 1910.253(e)(5)).  With respect to the hose cover, Plaintiffs deny that there is any evidence of any cut in the surface of the hose.  (*Id.* at 13).[4] Thus, Plaintiffs essentially argue that Defendant did not account for other possible causes in rendering his opinion regarding the condition of the hose.  Again, these alternate explanations are more appropriate issues for cross-examination than as a basis to exclude the testimony under Rule 702.  *See Chisesi Bros. Meat Packing Co., Inc.*, 2010 WL 3720465, at *4 ("Elimination of alternative possibilities is one method

---

[4] Plaintiffs dispute Mr. Edwards' observation that "[d]eformed crimp shells were cutting into the hose cover at the damaged fittings" and his conclusion that "the shipyard made the assembly incorrectly" and "[t]he hose was probably repaired since its initial assembly," for like reasons, viz. that there is no evidence of a cut in the hose.  (Report, at 27 ¶ 6, ECF No. 138-7).  Again, Plaintiffs will be permitted to dispute these conclusions and their fidelity to the facts on cross-examination.

- 21 -

of arriving at a result reliably, but it is not the only method.").

Finally, Plaintiffs object to Mr. Edwards' opinion that

[i]f exhaust ventilation was present, leakage from the torch was insufficient to create the described fire conditions at the scene of the accident.  The lack of odor recognition indicates that some exhaust ventilation near the torch was present before the accident.  Final damage or breach of the hose occurred just before the ignition of the fire.  Propylene volume from the final opening was farther away from the ventilation and overwhelmed the local area into the flammable range.

(Report, at 27 ¶ 7, ECF No. 138-7).  According to his related opinion, "[v]entilation was inadequate to prevent an accumulation of propylene from a hose tear.  This is a responsibility of the shipyard."  (*Id.* at 28 ¶ 8).  Plaintiffs generally respond that no ventilation or airflow testing was conducted, and no data is reported by Mr. Edwards in forming his opinion.  (Pl.'s Mem. L. Supp. Mot. Exclude, at 15, ECF No. 139).  Plaintiffs also dispute Mr. Edwards' description of the area as a "confined space," which is an OSHA-defined term and was not applied to the area in OSHA's report on the accident.  (*Id.* at 16).  Thus, Plaintiffs dispute the factual foundation of Mr. Edwards' claims.  Again, such disputes are better left to the factfinder, *see 14.38 Acres of Land*, 80 F.3d at 1077, after [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof."  *Wen Chyu Liu*, 716 F.3d at 168-69 (5th Cir. 2013) (quoting *Daubert*, 509 U.S. at 596).  However, the Court will exclude Mr. Edwards' testimony to the extent that it asserts a legal opinion on the "responsibility" of Ingalls.[5]  *See infra* (discussing Mr. Ellington's

---

5 Counsel should caution the witness regarding the inadmissibility of legal

opinion about the "responsibility" of Ingalls to prevent fires).  Hence, the [138]

Motion to Exclude Richard Edwards should be denied.

### D.    Joseph Ellington

Plaintiffs next [140] move to exclude Defendant's expert Joseph Ellington.

Mr. Ellington is a "Fire Practice Leader" with Rimkus Consulting Group., Inc. with

"over 38 years of experience in performing investigations of both small and large-

scale fire and explosion losses resulting in property damages, injury, and death."

(Report of Findings, at 3, ECF No. 140-7).  In this litigation, he has rendered

opinions concerning the causes of the fire, including its foreseeability and

preventability by Ingalls.  (*Id.* at 5-6).  Plaintiffs seek to exclude several of these

opinions in their Motion.

First, Plaintiffs dispute Mr. Ellington's opinion that "[t]he reason for the

release of fugitive propylene and cause of the fire was a failure related to either

improper assembly of the hose fittings by Ingalls or misuse or abuse of the

assembly." (Report of Findings, at 5 ¶ 3, ECF No. 140-7).  As with Mr. Edwards'

similar opinion, Plaintiffs claim that "the actual fire itself" could explain the abuse

to the hose found after the accident, as well as trampling by bystanders arriving to

the scene.  (Pl.'s Mem. L. Supp. Mot. Exclude, at 9, ECF No. 141).  Defendant points

out that Mr. Ellington bases his opinion on other information, including

investigative reports and physical evidence.  (Def.'s Mem. Br. Supp. Resp. Opp. Pl.'s

conclusions and the Court's ruling here.

Mot. Exclude, at 11-12, ECF No. 153).  The Court agrees.  Again, Plaintiffs'

alternative factual positions do not demonstrate that the expert's testimony should

be excluded.  The Court finds the following reasoning helpful with respect to an

expert's elimination of alternative theories:

> [A]n expert's ignorance of certain facts . . . is a matter of probative
> weight, rather than admissibility, of evidence. . . . In this particular
> case, Cequent's argument is even less compelling because the record
> simply raises the possibility that the locking nut was manually
> loosening without establishing that it in fact was loosened; the record
> does not 'establish[ ] specific intervening events that an expert was
> aware of but did not rule out.' . . . In cases where an expert's failure to
> rule out alternative possibilities is truly damaging to his reliability,
> the record establishes that specific intervening events occurred; though
> such events *possibly* intervened here, the record does not so clearly
> establish them.

*Villegas v. Cequent Performance Prods., Inc.*, Civ. No. SA-15-CV-473-XR, 2017 WL

816872, at *10 (W.D. Tex. Mar. 1, 2017) (emphasis in original) (citations omitted).

The record in this case does not conclusively establish that either the fire or

trampling caused the hose's condition; they are merely possibilities that affect the

weight of Mr. Ellington's opinion.[6]

Plaintiffs also dispute Mr. Ellington's opinion that "[p]roper fabrication,

maintenance, repair, testing, and inspection of the hose assembly by Ingalls would

have identified this damage and prevented the fire and resultant injuries."  (Report

---

[6] Per the same reasoning, Plaintiffs challenge Mr. Ellington's opinion that "Ingalls
failed to exercise ordinary and reasonable care in the fabrication, maintenance,
repair, and inspection of the equipment issued to Mr. Jackson, and as a result of
that failure, caused the fire and injuries that he sustained."  (Report of Findings, at
6 ¶ 6, ECF No. 140-7).  The Court disagrees for the same reasons.

of Findings, at 6 ¶ 4, ECF No. 140-7).  Plaintiffs invoke the fact that Ingalls cut 27 inches from the end of the hose which ignited the fire and tested the remaining 100 feet of the hose, which did not reveal a leak.  (Pl.'s Mem. L. Supp. Mot. Exclude, at 10, ECF No. 141).  Thus, Plaintiffs argue that there was no leakage from the remainder of the hose, so improper assembly or maintenance could not have been a cause of the fire.  Defendant answers that "leakage is not the only sign of damage" and that Mr. Ellington discovered "wear and tear, including burns, scuffs, nicks, and other signs of damage to the hose assembly."  (Def.'s Mem. Br. Supp. Resp. Pl.'s Mot. Exclude, at 12, ECF No. 153).  Again, the Court finds that Plaintiffs have expressed their frustration with Mr. Ellington's interpretations and conclusions, but have not shown that he employed a baseless, unreliable or unaccepted methodology. *See Rigsby*, 2010 WL 3359564, at *2 ("Without evidence that directly addresses flaws in Sinno's calculations or evidence that establishes that Sinno's methodology is not within professional engineering norms, the Court is not in a position to independently evaluate Sinno's engineering calculations or to conclude that the methodology he followed is not of a type generally accepted in the field.").  Likewise, here, Plaintiffs dispute this expert's interpretations of the evidence on a level more fit for cross-examination.

Next, Plaintiffs challenge Mr. Ellington's opinion that "[t]he harm, damage, and injury resulting from fires and explosions are reasonably foreseeable events that Ingalls had a responsibility to prevent."  (Report of Findings, at 6 ¶ 5, ECF No.

140-7).  Plaintiffs claim that the foreseeability of fires and explosions is within the understanding of the average person and "is not superior to any conclusion that the jury could draw for itself."  *See Buckley v. Singing River Hosp.*, 99 So. 3d 248, 257 (Miss. Ct. App. 2012).  Defendant argues that "Plaintiffs fail to even suggest how this opinion falls in the realm of a layperson, nor do they suggest how Mr. Ellington's expertise on this matter would fail to assist a trier of fact."  (Def.'s Mem. Br. Supp. Resp. Pl.'s Mot. Exclude, at 13, ECF No. 153).  Mr. Ellington reports having "over 38 years of experience in performing investigations of both small and large-scale fire and explosion losses resulting in property damages, injury, and death."  (Report of Findings, at 3, ECF No. 140-7).  The Court finds that Mr. Ellington's opinion on the foreseeability of the fire to Ingalls would be helpful to the jury in its determination of proximate causation.  *See Benefield v. Estate of Lockhart*, No. 1:15CV190-HSO-JCG, 2017 WL 1088120, at *6-7 (S.D. Miss. Mar. 15, 2017) (admitting a medical expert's opinion on the "medical foreseeability" of an accident involving a driver with coronary artery disease, which allegedly caused him to lose control of his vehicle).  As such, the Court finds that Mr. Ellington may testify on the subject from his background in fire and explosion investigation, subject to Plaintiffs' cross-examination.

Nevertheless, Plaintiffs also complain that Mr. Ellington's assertion of Ingalls' "responsibility to prevent" fires is an inadmissible legal opinion.  Plaintiffs argue the same regarding Mr. Ellington's opinion that "Ingalls knew or should have

known, the foreseeable and predictable consequence of their omissions and action, but instead, acted knowingly with full knowledge of the risks involved and deliberate disregard for the safety of both Mr. Jackson and other employees." (Report of Findings, at 6 ¶ 8, ECF No. 140-7).  The Mississippi Products Liability Act provides that Plaintiffs must prove proximate causation to recover.  *See* Miss. Code Ann. § 11-1-63(a)(iii).  "'Proximate cause of an injury is that cause which in natural and continuous sequence unbroken by any efficient intervening cause produces the injury and without which the result would not have occurred.'"  *Walker v. George Koch Sons, Inc.*, No. 2:07CV274-KS-MTP, 610 F. Supp. 2d 551, 561 (S.D. Miss. 2009) (citing *Delahoussaye v. Mary Mahoney's Inc.*, 783 So. 2d 666, 671 (Miss. 2001)).  The question of Ingalls' intervening acts or omissions in this matter implicates proximate causation, and both parties are entitled to dispute this element.  Under the facts of this case, the Court finds that expert opinions about Ingalls's "responsibility to prevent" fires could potentially mislead the jury or fail to assist them in determining proximate causation.  *See Coleman v. Swift Transp. Co. of Ariz., LLC*, No. 3:13CV003-DMB-SAA, 2014 WL 3533322, at *10 n. 9 (N.D. Miss. July 16, 2014) ("The defendants also argue that Sloan offered an opinion on whether VanAlstyne had a legal duty to provide adequate time and distance for Coleman to pass. . . . To the extent Sloan may be offering a legal conclusion, his testimony is inadmissible.") (citations omitted).  Moreover, whether Ingalls "acted knowingly" or with "deliberate disregard" also offers legal conclusions or factual determinations

outside of Mr. Ellington's field of expertise and may otherwise prove unhelpful or misleading to the jury. *See, e.g., Estate of Sturdivant v. Smith*, No. 5:19CV22-KS-MTP, 2021 WL 4048600, at *7 (S.D. Miss. Jan. 4, 2021) (citing *Gobert v. Caldwell*, 463 F.3d 339, 348 n. 29 (5th Cir. 2006) and *Campbell v. Sykes*, 169 F.3d 1353, 1371 (5th Cir. 1999)). Therefore, these portions of Mr. Ellington's opinion should be excluded.[7]

Next, Plaintiffs object to Mr. Ellington's opinion that "Ingalls failed to exercise ordinary and reasonable care in controlling and monitoring the space in which Mr. Jackson was assigned to work, and as a result of that failure, caused the injuries he sustained." (Report of Findings, at 6 ¶ 7, ECF No. 140-7). Plaintiffs reiterate that Mr. Ellington has no factual basis to opine on the safety of the workspace or the presence of any propylene or oxygen leaks prior to the accident because no such testing was conducted. (Pl.'s Mem. L. Supp. Mot. Exclude, at 13-14, ECF No. 141). Plaintiffs also repeat their claim that the work area was an "enclosed space" under OSHA regulations and that any attempt to reclassify it as a "confined space" to invoke heightened ventilation requirements is unreliable. (*Id.* at 14). In response, Defendant quotes Mr. Ellington's statement that "both confined and enclosed space operations have a greater likelihood of causing fatalities, severe injuries, and illnesses than any other type of shipyard work." (Report of Findings,

---

7 Counsel should caution the witness regarding the Court's ruling here.

at 24, ECF No. 140-7).  The Court finds that, to the extent the classification of Plaintiff's work area arises out of a factual dispute, this matter does not warrant exclusion of Mr. Ellington's opinion, especially since it explicitly does not hinge on said classification.  *See 14.38 Acres of Land*, 80 F.3d at 1077 ("'As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'") (citation omitted).  Hence, the Court finds that the [140] Motion to Exclude Joseph Ellington should be denied.

### E.    Ronald Moner

Finally, the Court considers Plaintiffs' [142] Motion to Exclude Defendant's Expert Mr. Ronald Moner.  Mr. Moner has "a Bachelor of Mechanical Engineering (1988) and a Master of Science in Mechanical Engineering (1996) with a minor in Mechanics from Cleveland State University," and he is "a Registered Professional Engineer within the State of Ohio" who is "currently employed by Parker-Hannifin Corporation ('Parker'), Hose Products Division," where he "hold[s] the position of Hose Engineering Manager."  (Expert Report, at 1, ECF No. 142-7).  In this litigation, Mr. Moner has issued several opinions concerning the integrity, composition, and safety of the hose at issue.  Plaintiffs object to several of these opinions in the relevant [142] Motion.

Plaintiffs first attack Mr. Moner's response to claims made by Plaintiffs' expert, Dr. Thomas Shelton.  Specifically, the former opined:

Expert Report of Thomas Shelton, Ph.D., P.E., is not applicable because the investigation and conclusions derived from hose connections used in the analysis[ ] do not resemble the hose connections in this case.  Also, the spring guards utilized[ ] simply transfer the strain from the fitting to the hose, just behind the spring guard, therefore minimizing the efficacy of the spring guard.

(Expert Report, at 2, ECF No. 142-7).  Where Mr. Moner distinguishes example hose connections illustrated by Dr. Shelton in his report from those present in this case, Plaintiffs defend Dr. Shelton's use of these examples as illustrations of compliance principles that remain the same "regardless of whether the hose connections look the same." (Pl.'s Mem. L. Supp. Mot. Exclude, at 9-10, ECF No. 143).  Defendant argues that Mr. Moner's distinctions are still helpful to the jury and argues that they are relevant to the issues of causation.  (Def.'s Mem. Br. Supp. Resp. Pl.'s Mot. Exclude, at 12, ECF No. 155).  Plaintiffs argue that Mr. Moner contradicts his opinion in his deposition testimony.  (*See* Dep. Ronald Moner, at 16:5-22, 94-95, ECF No. 142-9).  However, Mr. Moner simply agreed when asked whether "the primary purpose of the spring guard" is "to reduce repeating stress at a high stress area of a hose" and added that "[i]t can also be used as an abrasion." (*Id.* at 16:5-18).  Mr. Moner's agreement regarding the general purpose of spring guards does not contradict his opinion as applied to the spring guards at issue in this case. Hence, the Court cannot say that Mr. Moner's opinion is wholly lacking in factual support or sound methodology.  Moreover, the disagreement between Dr. Shelton and Mr. Moner is "a battle of the experts, and the jury must be allowed to make credibility determinations and weigh the conflicting evidence in order to decide the

likely truth of a matter not initially resolvable by common knowledge or lay

reasoning." *Garner*, 865 F.2d at 644 (quotation omitted).  Hence, the issues raised

by Plaintiffs are better resolved by the jury in its factfinding role.  *14.38 Acres of*

*Land*, 80 F.3d at 1077.

Next, Plaintiffs challenge Mr. Moner's opinion that "[g]iven that the hose

insert on the incident fittings does not extend past the end of the ferrule, thinning

of the wall or 'indentation of the Inner Tube' would not have occurred and therefore

[is] not applicable for this matter."  (Expert Report, at 12, ECF No. 142-7).

Plaintiffs dispute the factual basis of this opinion and make arguments regarding

the involved hose fitting components.  (Pl.'s Mem. L. Supp. Mot. Exclude, at 10,

ECF No. 143).  Once again, the Court is mindful of the "general rule" that

"questions relating to the bases and sources of an expert's opinion affect the weight

to be assigned that opinion rather than its admissibility and should be left for the

jury's consideration.'" *14.38 Acres of Land*, 80 F.3d at 1077.  Again, it is the

province of the jury, rather than the Court, to resolve factual intricacies after

"[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof."  *Wen Chyu Liu*, 716 F.3d at 168-69 (5th Cir.

2013) (quoting *Daubert*, 509 U.S. at 596).

Next, Plaintiffs challenge Mr. Moner's opinion that "[t]he welding hose in this

case should have been removed from service prior to the incident due to its

condition and wear based on the manufacturers['] warnings published in the Parker

4800 catalog including the applicable industry standards." (Expert Report, at 2, ECF No. 142-7). Plaintiffs offer evidence that the subject hose "was tested only 3 weeks before the accident and was found to be acceptable and put back into service." (Pl.'s Mem. L. Supp. Mot. Exclude, at 11, ECF No. 143) (citing Dep. Johnny Pope, at 147:13-17, ECF No. 142-10). Plaintiffs again propose that the fire itself, as well as the ensuing emergency, could have been the cause of the hose's condition. (*Id.*). Further, Plaintiffs repeat that Ingalls cut 27 inches of the hose behind the torch and found no leak in the remaining 100 feet of the hose. (*Id.*). However, as before, Plaintiffs' alternative explanations and contrary evidence are factual disputes which are better suited for jury determination than a *Daubert* motion. *See 14.38 Acres of Land*, 80 F.3d at 1077; *Chisesi Bros. Meat Packing Co.,* 2010 WL 3720465, at *4.

Next, Plaintiffs dispute Mr. Moner's opinion that "the red fuel hose shows clear signs of a previously sustained flashback event." (Expert Report, at 2, ECF No. 142-7). Plaintiffs claim that this opinion contradicts Mr. Moner's deposition testimony in which he denies that there are signs of such an event. (Dep. Ronald Moner, at 45:15-46:14, ECF No. 142-9). Defendant argues that Plaintiffs confuse Mr. Moner's testimony regarding borescopic images, which revealed no such indications, with the CT images, taken after the deposition, which do. (Def.'s Mem. Br. Supp. Resp. Pl.'s Mot. Exclude, at 16, ECF No. 155). Plaintiffs deem this evidence of a flashback event insufficient, consisting of only "topological images of

the general shape of the indication" and no evidence that could exclude other explanations, such as "an over pressurization event." (*Id.*).  Plaintiffs state that "at a minimum destructive testing" was needed to render these conclusions. (*Id.* at 13-14).  However, the Court finds that Plaintiffs' alternative explanations and arguments over the insufficiency of the evidence are better suited for weighing by the factfinder.  *See 14.38 Acres of Land*, 80 F.3d at 1077; *Chisesi Bros. Meat Packing Co.,* 2010 WL 3720465, at *4.

Finally, Plaintiffs challenge Mr. Moner's opinion as to "[t]he blue duct tape found on the red hose," which he claims "clearly points to the fact that there was an attempt to repair the hose.  It is highly probable that this attempted repair occurred between testing intervals." (Expert Report, at 2, ECF No. 142-7).  Plaintiffs decry this as speculation and list the aforementioned alternative explanations for the duct tape, including identification, citing OSHA regulations on that subject. (*Id.*) (citing OSHA § 1910.253(e)(5)).  Again, the Court finds that the weighing of the evidence and determination of the source of the duct tape is better left to the jury, which is charged with resolving disputed facts.  *See 14.38 Acres of Land*, 80 F.3d at 1077; *Chisesi Bros. Meat Packing Co.,* 2010 WL 3720465, at *4.  Hence, the Court finds that the [142] Motion to Exclude Ronald Moner should be denied.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [134] Daubert Motion Challenging the Admissibility of Plaintiffs' Expert, Brian Babcock's

Testimony, filed by Defendant Parker-Hannifin Corporation is **DENIED** except as where stated in this Order.

**IT IS FURTHER ORDERED AND ADJUDGED** that the [135] Motion to Exclude or Limit Testimony of Defendant's Expert Timothy Rhoades filed by Plaintiffs is **DENIED** except as where stated in this Order.

**IT IS FURTHER ORDERED AND ADJUDGED** that the [138] Motion to Exclude or Limit Testimony of Defendant's Expert Richard Edwards filed by Plaintiffs is **DENIED** except as where stated in this Order.

**IT IS FURTHER ORDERED AND ADJUDGED** that the [140] Motion to Exclude or Limit Testimony of Defendant's Expert Joseph Ellington filed by Plaintiffs is **DENIED** except as where stated in this Order.

**IT IS FURTHER ORDERED AND ADJUDGED** that the [142] Motion to Exclude or Limit Testimony of Defendant's Expert Ronald Moner filed by Plaintiffs is **DENIED** except as where stated in this Order.

**SO ORDERED AND ADJUDGED** this the 12th day of December, 2022.

s/ *Louis Guirola, Jr.*

LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE